IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIA ROSADO, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL NO. 4:CV-03-535 |
| | : | |
| v. | : | (Judge Jones) |
| | : | |
| RICHARD KISSINGER, JR., et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER

### January 24, 2007

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion for Summary Judgment ("Motion"), filed by Defendants Martin Dragovich, Marilyn Brooks, Shirley Moore, Diane Lenig-Mushinski,[1] and Donald Kelchner ("Defendants") on December 1, 2006. (Rec. Doc. 112). For the reasons that follow, the Motion will be denied.

## PROCEDURAL BACKGROUND:

On March 28, 2003, Plaintiff Maria Rosado ("Rosado") filed her first Complaint in this action. (Rec. Doc. 1). On January 9, 2004, Plaintiff Elizabeth

_____

[1] We are aware that Diane Lenig-Mushinski is listed as "Diane Lenig-Meshinski" on the docket and various submissions in this case. However, on May 20, 2002, she signed her "Investigation Summary - Alleged Sexual Misconduct" as "Lenig-Mushinski." Accordingly, we will assume that is the proper spelling of her last name and we will refer to her as such here.

1

Mitchell ("Mitchell") filed a similar Complaint, docketed with this Court at Civil No. 04-CV-42.  On January 23, 2004, Rosado filed an Amended Complaint with leave of Court.  (Rec. Doc. 51).  The two cases were consolidated at Civil No. 03-535 on March 22, 2004.

On December 1, 2006, Defendants filed the instant Motion.  (Rec. Doc. 112).  As the Motion has been fully briefed by the parties, the Motion is, therefore, ripe for disposition.

## STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them.  See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  See id. at 325.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor.  See Celotex, 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "As to materiality, the

substantive law will identify which facts are material."  Id. at 248.  A dispute is

considered to be genuine only if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Id.

## STATEMENT OF RELEVANT FACTS:

Although the parties agree about the general circumstances that gave rise to

the instant case, they disagree on several critical areas.  In our disposition of the

instant Motion, we will first examine the facts, undisputed and disputed, as

presented by the parties.  Then we will, where necessary, view the facts and all

inferences to be drawn therefrom in the light most favorable to the non-moving

party, Plaintiffs, in our analysis of the pending Motion.

Plaintiffs Mitchell and Rosado (collectively "Plaintiffs") are former inmates

who were incarcerated at the State Correctional Institution in Muncy, Pennsylvania

("SCI-Muncy").  (Rec. Docs. 114, ¶ 1; 125, ¶ 1; 128, ¶ 1).  Defendants, Donald

Kelchner ("Kelchner"), Martin Dragovich ("Dragovich"), Marilyn Brooks

("Brooks"), Shirley Moore ("Moore"), Diane Lenig-Mushinski ("Lenig-

Mushinski"), and Richard Kissinger ("Kissinger"), are present or former

4

employees at SCI-Muncy.  (Rec. Docs. 114, ¶ 2; 125, ¶ 2; 128, ¶ 2).  In September

2001, Defendant Brooks transferred from SCI-Muncy, having been promoted to

Superintendent at another State Correctional Institution.  (Rec. Docs. 114, ¶ 3; 125,

¶ 3; 128, ¶ 3).

Prior to January 11, 2002, no sexual misconduct on the part of Corrections

Officer Kissinger had been reported to Defendants.  (Rec. Docs. 114, ¶ 7; 125, ¶ 7;

128, ¶ 7).  Similarly, prior to January 11, 2002, neither the Department of

Corrections Office of Professional Responsibility nor the SCI-Muncy Security

Office had any record of complaints in which anyone – inmate, staff, visitor, or

relative of an inmate – alleged that Kissinger had sexually harassed an inmate or

had sexual contact with an inmate.  (Rec. Docs. 114, ¶¶ 4-5; 125, ¶¶ 4-5; 128, ¶¶ 4-

5).  In fact, prior to February 17, 2002, the automated grievance tracking system at

SCI-Muncy had no record of complaints in which anyone – inmate, staff, visitor, or

relative of an inmate – alleged that Kissinger had sexually harassed an inmate or

had sexual contact with an inmate.  (Rec. Docs. 114, ¶ 6; 125, ¶ 6; 128, ¶ 6).

However, on Friday, January 11, 2002, inmate Danielle Wallace ("Wallace")

filed a Form DC 135A Inmate Request to Staff Member ("Request") requesting

transfer to another institution.  (Rec. Docs. 114, ¶ 8; 125, ¶ 8; 128, ¶ 8).  The

Request voiced complaints concerning conditions in the Restricted Housing Unit

("RHU") ranging from mistreatment of inmates by corrections officers to a lack of heat in the RHU.  (Rec. Docs. 114, ¶ 9; 125, ¶ 9; 128, ¶ 9).  Notably, the Request also mentioned "one officer . . . ," "sexually and/or physically assaulting the females" in the RHU.  (Rec. Docs. 114, ¶ 10; 125, ¶ 10; 128, ¶ 10).  The Request did not specifically name the officer or any inmate(s) involved in the alleged assault(s).  (Rec. Docs. 114, ¶ 11; 125, ¶ 11; 128, ¶ 11).

On Wednesday, January 16, 2002, the SCI-Muncy Security Office received a memo directing the commencement of an investigation of Wallace's RHU allegations in the Request.  (Rec. Docs. 114, ¶ 12; 125, ¶ 12; 128, ¶ 12).  Sometime thereafter, Security Lieutenant Lenig-Mushinski was assigned to conduct the investigation.  (Rec. Docs. 114, ¶ 13; 125, ¶ 13; 128, ¶ 13).  Upon initiation of the investigation, Security Lieutenant Lenig-Mushinski conducted several interviews with inmates concerning Wallace's RHU allegations.  (Rec. Docs. 114, ¶ 14; 125, ¶ 14; 128, ¶ 14).

The parties disagree as to when Security Lieutenant Lenig-Mushinski began her interviews.  Defendants claim that Security Lieutenant Lenig-Mushinski conducted so-called "verbal interviews" of inmates Wallace, Brianna Bullet ("Bullet"), and Michelle Harris ("Harris") sometime between January 16, 2002 and January 28, 2002.  (See Rec. Doc. 114, ¶¶ 19-20).  Further, Defendants assert that

on or about January 28, 2002, Security Lieutenant Lenig-Mushinski's immediate superior, Security Captain Fultz, directed Lenig-Meshinski to conduct formal re-interviews of the inmates that she had verbally interviewed, and that on January 28, 2002, Lenig-Meshinski re-interviewed Wallace, Bullet, and Harris.  (Rec. Docs. 114, ¶¶ 19-20).  Written statements from at least two (2) of these interviews are included in the record.  (See Rec. Doc. 126, Exhs. 22, 23).

However, Plaintiffs claim that January 28, 2002 was the first date on which Lenig-Meshinski interviewed Wallace and Bullet.  (Rec. Docs. 125, ¶ 20; 128, ¶ 20).  Rosado asserts that Lenig-Meshinski's first interview of Harris also occurred on January 28, 2002.  (Rec. Docs. 125, ¶ 20; 128, ¶ 20).

The parties agree about a few of the outcomes of Security Lieutenant Lenig-Mushinski's first interviews.  First, the parties agree that during an interview with Security Lieutenant Lenig-Mushinski, Wallace provided Security Lieutenant Lenig-Mushinski with the names of Bullet and Harris, whom Wallace claimed would corroborate her RHU allegations.  (Rec. Docs. 114, ¶ 15; 125, ¶ 15; 128, ¶ 15).  Second, the parties agree that during her interview with Security Lieutenant Lenig-Mushinski, Harris reported that "Wallace was crazy and making the whole thing up because she was angry at having received a misconduct."  (Rec. Docs. 114, ¶ 16; 125, ¶ 16; 128, ¶ 16).

7

However, the parties disagree about several aspects of the Bullet and Wallace interviews.  First, Defendants assert that in Security Lieutenant Lenig-Mushinski's first "verbal interview" of Bullet, which allegedly took place prior to January 28, 2002, Bullet reported that "Wallace was crazy and making the whole thing up because she was angry at having received a misconduct."  (Rec. Doc. 114, ¶ 16).  In contrast, relying on a written statement from the January 28, 2002 interview, Plaintiffs assert that Bullet provided extensive information regarding sexual abuse and harassment by Kissinger.  (Rec. Docs. 125, ¶ 16; 126, Exh. 23; 128, ¶ 16).  Second, Plaintiffs claim that Wallace's January 28, 2002 interview yielded not only Bullet and Harris' names, but also significant detail regarding the allegations of sexual harassment and abuse of her and other inmates.  (Rec. Docs. 125, ¶ 15; 128, ¶ 15).

Defendants and Rosado agree that Security Lieutenant Lenig-Mushinski did not find either Bullet or Harris to be credible at the time of their initial interviews.  (Rec. Docs. 114, ¶ 17; 125, ¶ 17).

Thus, Defendants contend that during the initial investigation of Wallace's RHU allegations, Security Lieutenant Lenig-Mushinski found it difficult to find witnesses who would corroborate Wallace's allegations.  (Rec. Docs. 114, ¶ 15; 125, ¶ 15; 128, ¶ 15).  However, Plaintiffs dispute that contention.  (Rec. Docs.

125, ¶ 18; 128, ¶ 18).  Rather, Plaintiffs assert that prior to the February 17, 2002 incident involving Mitchell and Rosado, Security Lieutenant Lenig-Mushinski had interviewed "Wallace, Bullet, and Nicole Craig, all of whom told similar stories of Correctional Officer Kissinger sexually abusing and harassing not only them but several other inmates on multiple occasions."  (Rec. Docs. 125, ¶ 18; 128, ¶ 18).

The parties agree that two notable events occurred on January 28, 2002. First, Kissinger's name was linked to Wallace's RHU allegations.  (Rec. Docs. 114, ¶ 21; 125, ¶ 21; 128, ¶ 21).  Second, following formal interviews of Wallace, Bullet, and Harris, Security Lieutenant Lenig-Mushinski asked that the deadline for the investigation, apparently set for the January 29, 2002, be extended due to the number of additional inmate interviews that she felt she needed to conduct.  (Rec. Docs. 114, ¶ 22; 125, ¶ 22; 128, ¶ 22).

On January 29, 2002, an interview concerning Wallace's RHU allegations was conducted with inmate Tyeesha McCowan, during which she stated that she had never witnessed Kissinger perform any type of unprofessional actions in the RHU, but that she had heard rumors of such actions.  (Rec. Docs. 114, ¶ 23; 125, ¶ 23; 128, ¶ 23).  However, Rosado asserts that the Investigation Summary reveals that McCowan also reported that Kissinger would "pass things" in the RHU and give her mail from other inmates and library books.  (Rec. Docs. 125, ¶ 23).

On or around February 1, 2002, Kissinger was transferred out of the RHU, and as of that date, began to work in G Unit, the custodial unit in which Rosado and Mitchell were staying.  (Rec. Docs. 114, ¶¶ 24-25; 125, ¶¶ 24-25; 128, ¶¶ 24-25).

Mitchell claims that both Deputy Superintendent Moore and Superintendent Dragovich testified that the normal procedure for transfer during an investigation is to non-custodial units (doc. 128, ¶ 24), and that Defendants failed to follow that protocol both after Wallace's January 11, 2002 allegation and the February 17, 2002 incident involving Mitchell and Rosado.  While Rosado and Mitchell were housed in G Unit in February 2002, Kissinger worked there a total of seven days: February 1, 7, 8, 9, 10, 15, and 17.  (Rec. Docs. 114, ¶ 25; 125, ¶ 25; 128, ¶ 25). Relying on an apparent response to an interrogatory as to Kissinger's work assignments (see doc. 126-14, Pl.'s Exh. 30), Plaintiffs note that Kissinger also worked in the G Unit for twenty-five (25) days between July 2002 and the date of his arrest.  (Rec. Docs. 125, ¶ 25; 128, ¶ 25).

On February 6, 2002, inmate Nicole Craig was interviewed, and she made statements corroborating the general nature of Wallace's allegations.  (Rec. Docs. 114, ¶ 27; 125, ¶ 27; 128, ¶ 27).  Rosado claims that the Investigation Summary indicates that Craig also gave details of sexual misconduct by Kissinger.  (Rec.

Doc. 125, ¶ 27).  Also on February 6, 2002, an interview was conducted with

inmate Eva Moore  ("Eva"), during which Eva stated that she had never witnessed

any unprofessional conduct or sexual misconduct involving staff or inmates in the

RHU.  (Rec. Docs. 114, ¶ 26; 125, ¶ 26; 128, ¶ 26).  Plaintiffs claim that this

testimony was later recanted on April 10, 2002, and that on said date, she

confirmed Kissinger's sexual misconduct.  (Rec. Docs. 125, ¶ 26; 128, ¶ 26).

On February 17, 2002, Mitchell's roommate, inmate Victoria Wildasin,

informed at least one SCI-Muncy Lieutenant that Mitchell and Rosado had been

subjected to sexual misconduct on same date by a corrections officer.  (Rec. Docs.

114, ¶ 28; 125, ¶ 28; 128, ¶ 28).  Thus, neither Rosado nor Mitchell were the first

inmate to report the alleged sexual assault perpetrated upon them by Kissinger.

(Rec. Docs. 114, ¶ 29; 125, ¶ 29; 128, ¶ 29).

Following Wildasin's report, Mitchell was called to a Lieutenant's office

and a Lieutenant questioned her.  (Rec. Docs. 114, ¶ 30; 125, ¶ 30; 128, ¶ 30).

Another Lieutenant was also called in and questioned Mitchell.  (Rec. Docs. 114, ¶

31; 125, ¶ 31; 128, ¶ 31).

Mitchell was then sent back to her room; later in the day, both Mitchell and

Rosado were questioned and also removed from their housing unit and placed in

the RHU.  (Rec. Docs. 114, ¶ 32; 125, ¶ 32; 128, ¶ 32).  Mitchell and Rosado were

initially placed in the RHU for a term of ten (10) days for their protection and for an investigation.  (Rec. Docs. 114, ¶ 33; 125, ¶ 33; 128, ¶ 33).  However, Mitchell and Rosado actually remained in the RHU for an additional ten (10) days, until March 8, 2002.  (Rec. Docs. 114, ¶¶ 34, 41; 125, ¶¶ 34, 41; 128, ¶¶ 34, 41).  During the time that Mitchell and Rosado were in the RHU, a number of inmates submitted DC-135A Request to Staff forms.  (Rec. Docs. 114, ¶ 35; 125, ¶ 35; 128, ¶ 35).

Defendants contend that the contents of the DC-135A Request to Staff forms tended to cast doubt on the veracity of Rosado and Mitchell's allegations against Kissinger.  (Rec. Doc. 114, ¶ 35).  Plaintiffs dispute that contention.  (Rec. Docs. 125, ¶ 35; 128, ¶ 35).

On February 19, 2002, the investigation of Wallace's RHU allegations and the investigation of the February 17, 2002 incident involving Mitchell and Rosado were combined.  (Rec. Docs. 114, ¶ 37; 125, ¶ 37; 128, ¶ 37).

On February 25, 2002, Security Lieutenant Lenig-Mushinski interviewed Kissinger and concluded that he was lying when he denied any sexual misconduct.  (Rec. Docs. 114, ¶ 38; 125, ¶ 38; 128, ¶ 38).  Plaintiffs accurately note that despite Security Lieutenant Lenig-Mushinski's conclusion, nearly one full year, from February 25, 2002 until February 6, 2003, passed before Kissinger suffered any

legal or employment consequences for the February 17, 2002 incident.  (Rec. Docs. 114, ¶ 58; 125, ¶¶ 38, 58; 128, ¶ 58).

After moving out of the RHU on March 8, 2002, Mitchell was repeatedly interviewed, possibly as often as daily, by Security Lieutenant Lenig-Mushinski as part of the ongoing investigation.  (Rec. Docs. 114, ¶ 36; 125, ¶ 36; 128, ¶ 36).  Rosado recalls be interviewed three (3) times by prison staff, and later by the Pennsylvania State Police.  (Rec. Docs. 114, ¶ 40; 125, ¶ 40; 128, ¶ 40).  However, there were no employee witnesses against Kissinger.  (Rec. Docs. 114, ¶ 39; 125, ¶ 39; 128, ¶ 39).

In early March 2002, Donald Kelchner, then Superintendent at SCI-Muncy, requested that the Department of Corrections Office of Professional Responsibility ("OPR") become involved in the investigation of the allegations against Kissinger. (Rec. Docs. 114, ¶ 49; 125, ¶ 49; 128, ¶ 49).  The OPR is the internal investigative division of the DOC that may be called in when investigations will require expertise beyond that of the individual institution's Security Office, such as when administration of polygraphs is necessary.  (Rec. Docs. 114, ¶ 50; 125, ¶ 50; 128, ¶ 50).

The Pennsylvania State Police ("State Police") became involved in the investigation of the allegations against Kissinger at least as early as March 20,

2002.  (Rec. Docs. 114, ¶ 51; 125, ¶ 51; 128, ¶ 51).  Defendants assert that the

State Police became involved at SCI-Muncy's request (doc. 114, ¶ 51), but

Mitchell was unwilling to admit this allegation because she does not know whether

SCI-Muncy, the Central Office, or OPR requested the State Police's involvement

(doc. 128, ¶ 51).

From March 27, 2002 until April 1, 2002, a period of five (5) days, Rosado

received attention in the Mental Health Unit ("MHU") at SCI-Muncy.  (Rec. Docs.

114, ¶ 45; 125, ¶ 45; 128, ¶ 45).  The MHU is staffed by doctors, nurses, and

counselors, as well as corrections officers.  (Rec. Docs. 114, ¶ 47; 125, ¶ 47; 128, ¶

47).  Defendants contend that Kissinger was assigned to the MHU on March 25

and 26, and that his shift <u>may</u> have overlapped with the beginning of Rosado's stay

there.  (Rec. Doc. 114, ¶ 46).  However, Rosado accurately indicates that Kissinger

testified that Rosado was, indeed, housed in the MHU for some period of time

while he was working in the MHU.  (Rec. Doc. 125, ¶ 46; Exh. B at 83).

Defendants contend that Security Lieutenant Lenig-Mushinski "actively

continued with the investigation, interviewing twenty-three inmates – many several

times, up to at least April 19th, 2002, thereby overlapping with OPR's and the

Pennsylvania State Police involvement/investigation."  (Rec. Doc. 114, ¶ 54).

Plaintiffs vigorously deny any suggestion that Security Lieutenant Lenig-

Mushinski's investigation was either prompt or thorough, claiming that Security Lieutenant Lenig-Mushinski and Deputy Superintendent Moore became convinced that Kissinger was lying and had committed the sexual misconduct when Security Lieutenant Lenig-Mushinski interviewed Kissinger on February 25, 2002.  (Rec. Doc. 128, ¶ 54).  Although we found no testimony from Deputy Superintendent Moore that she had come to that conclusion on the aforementioned date, the record confirms that Security Lieutenant Lenig-Mushinski was convinced of such on said date.  (Rec. Doc. 126, Exh. 6 at 23).

The parties agree that on May 20, 2002, Security Lieutenant Lenig-Mushinski submitted an "Investigation Summary - Alleged Sexual Misconduct" to Deputy Superintendent Moore.  Further, the record confirms Plaintiffs' assertion that Security Lieutenant Lenig-Mushinski gathered no additional evidence after her May 20, 2005 report.  (Rec. Doc. 128, ¶ 54; 126, Exh. 6 at 29).

However, the State Police's investigation was ongoing.  During the course of that investigation, the State Police administered polygraph tests to five inmates: Mitchell and Rosado on April 5, 2002; Lisa Jackson and Michelle Harris on September 18, 2002; and Florette Reed on September 20, 2002.  (Rec. Docs. 114, ¶ 55; 125, ¶ 55; 128, ¶ 55).  Plaintiffs allege that all inmates passed their polygraph tests, but nothing in the record confirms or rebuts the allegation.

15

Relying on testimony from Superintendent Dragovich and Deputy Superintendent Moore, Defendants assert that following the February 17, 2002 incident, "direction was given and efforts were made to try to ensure that . . . Kissinger was assigned to posts with other staff, during daylight where he would not have an opportunity to engage in the misconduct of which he was accused." (Rec. Doc. 114, ¶ 52).  Plaintiffs dispute this assertion, relying on testimony from Kissinger that he was never told to stay away from either Mitchell or Rosado following the incident.  (Rec. Docs. 128, ¶ 48; 125, ¶ 52; Exh. B at 82-83). Plaintiffs also rely on a response to a discovery request that indicates that from July 1, 2002 through his February 6, 2003 arrest, Kissinger worked seventy-four (74) out of one hundred, twenty-nine (129) days in housing units similar to the one in which the February 17, 2002 incident occurred, including twenty-five (25) of those in the same G unit as the alleged incident occurred and eleven (11) days in the MHU.  (Rec. Docs. 125, ¶ 52; 128, ¶ 52; Exh. 30).

On October 31, 2002, Deputy Superintendent Moore recommended that SCI-Muncy's investigation be suspended pending direction from the State Police. (Rec. Docs. 114, ¶ 56; 125, ¶ 56; 128, ¶ 56).  Plaintiffs accurately note that on same date, Moore had received an update on the investigation from Security Lieutenant Lenig-Mushinski, which indicated that "[t]he institution cannot proceed

16

until [State Police] Trooper Holmes files the necessary paperwork with the District Attorney due to no supporting staff witnesses to these alleged sexual misconduct acts by Officer Kissinger."  (Rec. Docs. 128, ¶ 56; 126, Exh. 8 at 1).

On February 6, 2003, the State Police notified SCI-Muncy's Security Office that an affidavit of probable cause had been filed, requesting an arrest warrant for Kissinger, and that the arrest would take place on February 6, 2003.  (Rec. Docs. 114, ¶ 57; 125, ¶ 57; 128, ¶ 57).  Kissinger was arrested at 1405 hours (2:05 p.m.) on February 6, 2003.  (Rec. Docs. 114, ¶ 58; 125, ¶ 58; 128, ¶ 58).  Following his arraignment, Kissinger was suspended from his position at SCI-Muncy without pay.  (Rec. Docs. 114, ¶ 59; 125, ¶ 59; 128, ¶ 59).  Rosado notes that Kissinger was ultimately convicted of charges arising out of the February 17, 2002 incident. (Rec. Docs. 125, ¶ 35).  Kissinger's own testimony confirms that he was convicted of indecent exposure, official oppression, and criminal solicitation.   (Rec. Doc. 126, Exh. 2 at 14-15).

From the time that Mitchell moved out of the RHU on March 8, 2002 until Kissinger's suspension, she was incarcerated at SCI-Muncy for a total of six (6) months: from March 8, 2002 until her parole on May 21, 2002, and upon her recommitment on September 6, 2002 until her transfer to another State Correctional Institution on January 7, 2003.  (Rec. Docs. 114, ¶ 41; 125, ¶ 41; 128,

¶ 41).  During those six (6) months, Mitchell saw Kissinger "a few times."  (Rec. Docs. 114, ¶ 43; 125, ¶ 43; 128, ¶ 43).  However, Mitchell claims that one (1) of those times was on the date of her return to SCI-Muncy, September 6, 2002.  (Rec. Doc. 128, ¶ 43).

From the time that Rosado moved out of the RHU on March 8, 2002 until Kissinger's suspension, she was incarcerated at SCI-Muncy for a period over one year, beyond Kissinger's February 6, 2003 suspension.  (Rec. Docs. 114, ¶ 42; 125, ¶ 42; 128, ¶ 42).  During that year, Rosado saw Kissinger only a "couple of times," which she clarified to mean "about eight or nine times."  (Rec. Docs. 114, ¶ 44; 125, ¶ 44; 128, ¶ 44).  Rosado testified that she usually saw Kissinger standing "right in front of" her housing unit when she would get off work and return to her housing unit.  (Rec. Doc. 125, ¶ 44; Exh. A at 3-4).

Kissinger cannot recall ever seeing either Mitchell or Rosado, but he assumes that he must have.  (Rec. Docs. 114, ¶ 48; 125, ¶ 48; 128, ¶ 48).  Rosado accurately indicates that Kissinger testified that he was "fairly sure" he would have seen Rosado in the MHU and that Rosado would have seen him and that he would have seen "just about every inmate" during the periods in which he was put on the "rover" or "GP Rec" shifts, and that he was "sure" that he would have seen Rosado and Mitchell when working in those positions and they would have seen him.

(Rec. Docs. 125, ¶ 48; Exh. B at 87-89).

On March 21, 2003, a pre-disciplinary conference was held which resulted in Kissinger's termination from his position with the DOC. (Rec. Docs. 114, ¶ 60; 125, ¶ 60; 128, ¶ 60). Thus, SCI-Muncy's investigation of the allegations against Kissinger was not closed until sometime after February 7, 2003. (Rec. Docs. 114, ¶ 66; 125, ¶ 66; 128, ¶ 66).

At all times relevant to the allegations against Kissinger, at least three documents relating to the conduct of Department of Corrections' employees and the discipline thereof were in effect. (Rec. Docs. 114, ¶¶ 61-63; 125, ¶¶ 61-63; 126, Exh. 19; 128, ¶¶ 61-63).

First, the Governor's Code of Conduct was in effect. (Rec. Docs. 114, ¶ 62; 125, ¶ 62; 128, ¶ 62). Parties dispute whether it was followed at all times relevant hereto: Defendants argue that it was (doc. 114, ¶ 62) and Plaintiffs argue that it was not (docs. 125; ¶ 62; 128, ¶ 62). The parties agree that there is no requirement, either under the Governor's Code of Conduct or within the DOC, that an employee facing allegations of sexual misconduct, who has not yet been criminally charged, be suspended or terminated. (Rec. Docs. 114, ¶ 69; 125, ¶ 69; 128, ¶ 69). However, Rosado accurately notes that Deputy Superintendent Moore testified that criminal charges are not required to terminate an employee either. (Rec. Doc. 125,

¶ 69; Exh. C at 55).   Moreover, Mitchell contends that the provision affording the disciplinary action in the event of "Sufficient Reason for Disciplinary Action," as defined in Part III - 1(e), was ignored by the SCI-Muncy Administration for one year.  (Rec. Doc. 128, ¶ 62).

Second, the DOC Code of Ethics Handbook was in effect, and on January 24, 2000, Kissinger received a copy thereof and signed a DC-173 Receipt of Code of Ethics Handbook.  (Rec. Docs. 114, ¶ 63; 125, ¶ 63; 128, ¶ 63).

Third, the DOC Policy Statement relating to the sexual harassment/sexual abuse of inmates, DC-ADM 008, which is issued to all DOC employees, was also in effect.  Said policy outlines the actions to be taken when there are claims of sexual impropriety on the part of DOC employees.  (Rec. Docs. 114, ¶ 61; 125, ¶ 61; 128, ¶ 61).  Plaintiff asserts that such policy requires a ten (10) day time frame for investigations of sexual harassment.  (Rec. Docs. 125, ¶ 61; 128; ¶ 61).  However, Plaintiffs' readings are inaccurate: the ten-day window to which Plaintiff refers is applicable to the initial review and response to the allegations.  (Rec. Doc. 126, Exh. 19 at 4).  The policy goes on to provide that if the allegations need to be more formally investigated, information gathered shall be forwarded to the Facility Manager, who shall then determine whether to request an investigation by the Office of Professional Responsibility ("OPR").  (Rec. Doc. 126, Exh. 19 at 4).

The parties agree that DOC policy requires a pre-disciplinary conference ("PDC") prior to disciplinary actions such as suspension or termination being undertaken as against an employee. (Rec. Docs. 114, ¶ 65; 125, ¶ 65; 128, ¶ 65). Under DOC policy, a PDC would not be held in the middle of an investigation. (Rec. Docs. 114, ¶ 66; 125, ¶ 66; 128, ¶ 66). Additionally, Deputy Superintendent Moore testified that only the Superintendent can convene a PDC. (Rec. Doc. 125, Exh. C at 84-85). However, Rosado accurately indicates that Deputy Superintendent Moore also testified that a PDC can be conducted without an investigation, and that as of the date she ordered SCI-Muncy's investigation of Kissinger be suspended, she had the authority to counsel Kissinger or give him a verbal or written reprimand; to recommend that Kissinger be suspended, terminated, or otherwise disciplined; and to assign Kissinger's duties and location(s) where they would be performed. (Rec. Doc. 125, ¶ 69; Exh. C at 55, 79, 83, 85).

Prior to the investigation of the allegations against Kissinger, other investigations of sexual misconduct by an employee were been conducted by the staff at SCI-Muncy, as required by the Governor's Code of Conduct and DOC policy, and they ended in disciplinary action against the employee involved. (Rec. Docs. 114, ¶ 64; 125, ¶ 64; 128, ¶ 64). Testimony by Security Lieutenant Lenig-

21

Mushinski indicates that such investigations usually lasted between ten (10) and thirty (30) days, and that testimony by Deputy Superintendent Moore indicates that they typically lasted one to two (2) weeks.  (Rec. Doc. 126, Exhs. 5 at 23, 6 at 26).

## DISCUSSION:

Plaintiffs have brought several § 1983 claims arising out of the February 17, 2002 incident.  Rosado's Amended Complaint (doc. 51) alleges violations of the First, Eighth, and Fourteenth Amendments.  Mitchell's Complaint, docketed with this Court at Civil No. 04-CV-42, alleges violations of the Eighth and Fourteenth Amendments.  However, in essence, Plaintiffs claim that Defendant Kissinger violated their constitutional rights by forcing them to engage in sexual acts with one another on said date and that the remaining Defendants, SCI-Muncy officials, demonstrated deliberate indifference to Plaintiffs' constitutional rights by acting and/or failing to act in a variety of ways both before and after February 17, 2002.

In the instant Motion (doc. 112), all Defendants except Kissinger have requested summary judgment on all of Plaintiffs' § 1983 claims.

Although our typical disposition of a summary judgment motion would address each of Plaintiffs' claims in turn, the Court sees no reason to do so here.  As our extensive recitation of the facts above makes clear, the parties in this action disagree on a myriad of material facts that bear on all claims.  For example, in any

protracted analysis of whether Defendants were deliberately indifferent to Plaintiffs' constitutional rights prior to the February 17, 2002 incident, <u>see</u> <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001), resolving such questions as when SCI-Muncy officials first interviewed inmates following Wallace's January 11, 2002 allegation that a correctional officer was "sexually and/or physically assaulting the females" in the RHU (docs. 114, ¶ 10; 125, ¶ 10; 128, ¶ 10) and what statements were made during those interviews would be critical.  By way of further example, questions involving whether and/or the extent to which, following the February 17, 2002 incident, "direction was given and efforts were made to try to ensure that . . . Kissinger was assigned to posts with other staff, during daylight where he would not have an opportunity to engage in the misconduct of which he was accused" are also pivotal.  (Rec. Doc. 114, ¶ 52).  Given the vigorous disagreement between the parties on these and other material issues, their resolution must necessarily be reserved for trial.

In short, the submissions before this Court indicate that significant factual questions remain as to what Defendants did, did not, and should have done, in light of the knowledge that they possessed following the January 11, 2002 allegation and the February 17, 2002 incident.  We will not endeavor to wade further through the morass of contested facts, as we are confident that it would not alter our

determination.  Accordingly, and because any grant of summary judgment at this juncture would be entirely improvident, we will deny the Motion.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.   Defendants' Motion for Summary Judgment (doc. 112) is hereby

     **DENIED**.

2.   Because no brief was filed in support thereof, Defendants' Motion for

     Summary Judgment (doc. 100) is hereby deemed **WITHDRAWN**

     pursuant to Local Rule 7.5 of the Local Rules for the Middle District

     of Pennsylvania.

                                        s/ John E. Jones III
                                        John E. Jones III
                                        United States District Judge